[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-10375

_____

Agency No. FTC 9327

POLYPORE INTERNATIONAL, INC.,
a corporation,

Petitioner,

versus

FEDERAL TRADE COMMISSION,

Respondent.

_____

Petition for Review of a Decision of
the Federal Trade Commission

_____

(July 11, 2012)

Before EDMONDSON, ANDERSON, and FARRIS,[*] Circuit Judges.

ANDERSON, Circuit Judge:

Polypore International appeals the Federal Trade Commission's decision

_____

[*] Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

finding a violation of § 7 of the Clayton Act and ordering divestiture. The Commission held that Polypore's February 2008 acquisition of Microporous would substantially lessen competition or tend to create a monopoly in relevant markets.

I. FACTS AND PROCEDURAL HISTORY

Polypore and the acquired Microporous Products are producers of battery separators. Battery separators are membranes installed between the positive and negative plates in flooded lead-acid batteries to prevent short circuits and to regulate the flow of electrical current between the plates. The manufacturers of these separators make them for different types of batteries and their size and thickness are adjusted accordingly. Different types of batteries also perform better with separators made of different materials.

Polypore, through its Daramic division, primarily manufactured pure polyethylene ("PE") separators for use in automotive and motive batteries. Automotive batteries, also known as starter-lighter-ignition ("SLI") batteries, are used in cars, trucks, buses, boats, and jet skis, while motive batteries are used in mobile industrial machines such as forklifts and mining equipment. Daramic also produced separators for deep-cycle batteries, which are used in equipment that requires a lower amperage over a longer period of time. Daramic had two production plants in the United States and five overseas.

2

The much smaller Microporous (formerly known as Amerace) manufactured pure rubber battery separators (called Flex-Sil) for use in deep-cycle batteries and a line of rubberized PE-based separators (CellForce) for use in motive batteries. Microporous did not yet actually sell in the SLI battery market although for several years they had been investigating entry into that market. Microporous operated one plant in Piney Flats, Tennessee, and constructed one in Feistritz, Austria, which was not yet operational and was intended to serve European customers. Microporous had also purchased equipment for another production line that the parties refer to as the "line in boxes" and which constituted some of the acquired assets.

Microporous's Flex-Sil product was recognized as being the industry standard for deep-cycle batteries. Polypore introduced its Daramic HD product for the deep-cycle market, which is made of latex-coated polyethylene. It is arguably not as effective, and is used in low-end batteries. Despite a higher price, Microporous's Flex-Sil still controlled 90% of the market, while Daramic controlled the remaining 10%. The market shares were the opposite in the motive market, with Daramic owning 90% to Microporous's 10%.

The other company that produces battery separators in the United States is Entek. Entek produces separators for SLI batteries but ceased producing separators

for motive batteries. Entek and Daramic alone competed in the SLI market, with Entek controlling 52% of sales to Daramic's 48%. One of the battery producers testified, however, that Daramic and Entek did not behave as competitors. SLI production accounts for three-quarters of all battery separator production. There are numerous other separator producers in Europe and Asia but they do not sell to North American battery makers.

The Commission identified these three battery types[1] as the relevant product markets and North America as the geographic scope of each. Major customers for the battery separators were Johnson Controls ("JCI"), the largest manufacturer of SLI batteries; Exide, the global leader in motive power batteries; Trojan Battery Company, the global leader in deep-cycle batteries and Microporous's largest customer; East Penn Battery; Crown Battery; EnerSys; Douglas Battery, which makes motive and deep-cycle batteries; and U.S. Battery, which makes deep-cycle batteries.

In the early to mid 2000s, Microporous began testing the waters of the SLI market. One of Daramic's vice presidents, Tucker Roe, testified that its largest customer, JCI, told him that Microporous was bidding on SLI contracts in 2003.

---

[1] The ALJ identified a fourth battery type – the uninterruptible power source ("UPS") – but the Commission rejected that finding, and it is not at issue on appeal.

4

Daramic responded to this information by convincing JCI to enter into a long-term supply contract by suggesting that it would cut off supply to JCI's European facilities if JCI declined Daramic's long-term contract. Microporous in fact ran sample SLI separators for JCI in 2003 and 2004, and obtained for its product the status of "qualified" by JCI. For other reasons, however, JCI ultimately entered into a contract with Entek. Microporous began talks in 2007 with Exide about producing SLI separators for Exide's North American and European markets, and the two companies entered into memoranda of understanding in September 2007 and February 2008. Exide tested some of the sample separators that Microporous created, and planned to purchase Microporous separators beginning in 2010. Polypore was concerned about losing East Penn Battery to Microporous after it learned of Microporous's overtures in this area, and the Commission found that Polypore made price concessions in order to retain East Penn's business.

Polypore internal memos reveal that it had developed the "MP Plan," which was a response to competition from Microporous. The MP Plan sought to secure long-term contracts with customers that Polypore thought were in danger of switching to Microporous. Internal memos reveal Polypore's concern about losing business to this "real threat." Polypore's 2008 budget projected that Daramic would lose increasing amounts of business to Microporous and would be forced to

reduce prices if it did not acquire Microporous. Indeed, Daramic froze its 2009 prices because of fear about Microporous. One battery producer, EnerSys, used Microporous's prices in the motive market as leverage to bring down Daramic's prices, succeeding in that effort in 2004. Polypore was also concerned that it would lose East Penn's business if it did not act.

The president of Daramic put Microporous on the top of his list of potential acquisitions to "eliminate price competition." The 2008 budget predicted that it could increase the prices of CellForce and Microporous's industrial products if it did acquire Microporous. Microporous was in the process of expanding its production capacity in both North America and Europe, constructing a new plant in Feistritz, Austria, with two PE lines that could produce either motive or SLI battery separators. Its plan was to shift production of its motive battery separators for European customers to Austria so that it could increase that production for domestic customers in the United States. A March 2005 memo from the Daramic head of sales to the CEO warned that Microporous's plans for expansion into a second line would result in a loss of customers for Daramic. Through the next two years, the threat of Microporous's expansion was the subject of numerous memoranda, and acquisition was discussed as a means to avoid costly competition.

The Commission issued an administrative complaint on September 9, 2008.

Specifically relevant to the issues in this appeal, the FTC charged that Polypore's acquisition of Microporous may substantially lessen competition or tend to create a monopoly for several types of battery separators, in violation of § 7 of Clayton Act.[2] After a four-week hearing, the ALJ issued an extensive opinion holding that the acquisition was reasonably likely to substantially lessen competition in four relevant markets. It ordered the divestiture of all acquired assets, including the plant in Austria. Polypore appealed the decision to the Commission, which issued a comprehensive opinion affirming the decision for three of the relevant markets – SLI, motive, and deep-cycle – but not for the fourth, UPS batteries. Thus, it issued a modified divestiture order. On appeal, Polypore argues that the Commission erred when it employed the <u>Philadelphia National</u>[3] presumption to find that Polypore had illegally merged to a duopoly in the SLI market. It also asserts that the Commission erred when it found one market for both Microporous's and Polypore's deep-cycle battery separators, and that Entek would not enter the motive battery separator market. Finally, Polypore challenges the Commission's inclusion

---

[2]     The complaint also charged Polypore with entering into an unlawful joint marketing agreement with Hollingsworth & Vose, in violation of § 5 of the FTC Act, and that Daramic monopolized the alleged relevant markets, in violation of § 5, by executing contracts with large customers that would preclude or deter Microporous from competing effectively. The ALJ found against Polypore on the first count but against complaint counsel on the second. Neither decision was appealed to the Commission.

[3]     <u>United States v. Philadelphia National Bank</u>, 374 U.S. 321, 83 S. Ct. 1715 (1963).

of Microporous's Austrian plant in the divestiture order.

## II. STANDARD OF REVIEW

We review the Commission's legal conclusions de novo. Schering-Plough Corp. v. FTC, 402 F.3d 1056, 1063 (11th Cir. 2005). We also review the application of the facts to the law de novo. FTC v. Ind. Fed'n of Dentists, 476 U.S. 447, 454, 106 S. Ct. 2009, 2016 (1986). Our review of the factual findings is governed by 15 U.S.C. § 45(c), which provides that "[t]he findings of the Commission as to the facts, if supported by evidence, shall be conclusive." The statute forbids a court to "make its own appraisal of the testimony, picking and choosing for itself among uncertain and conflicting inferences." FTC v. Algoma Lumber Co., 291 U.S. 67, 73, 54 S. Ct. 315, 318 (1934). The court must accept the Commission's findings of fact if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477, 71 S. Ct. 456, 459 (1951) (quotation marks omitted). We accord deference to the Commission's chosen remedy for violations of the Act. Jacob Siegel Co. v. FTC, 327 U.S. 608, 611, 66 S. Ct. 758, 760 (1946).

## III. DISCUSSION

### A. SLI Separators

Polypore argues that the Commission erred when it analyzed the acquisition as a horizontal merger by treating Microporous as an actual competitor in the SLI separator market rather than a potential competitor. By treating Microporous as an actual competitor, Polypore also argues that the Commission improperly relied on the presumption of liability found in Philadelphia National. Polypore argues that the Commission should have used only the potential competition doctrine because Microporous had not entered the SLI market at the time of the acquisition or in the years beforehand.

Section 7 of the Clayton Act prohibits acquisitions "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or tend to create a monopoly." 15 U.S.C. § 18. Congress enacted § 7 to "arrest anticompetitive tendencies in their 'incipiency.'" United States v. Phila. Nat'l Bank, 374 U.S. 321, 362, 83 S. Ct. 1715, 1741 (1963) (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 317, 322, 82 S. Ct. 1502, 1519-20, 1522 (1962)). In Philadelphia National, the Supreme Court determined that the "intense congressional concern" with economic concentration counseled against requiring

9

"elaborate proof of market structure, market behavior, or probable anticompetitive effects." Id. at 363, 83 S. Ct. at 1741. Instead, the Court stated,

> a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects.

Id. This test, it reasoned, comported with economic theory because competition is "greatest when there are many sellers, none of which has any significant market share . . . ." Id. (quotation and citation omitted).[4]

In United States v. El Paso Natural Gas Co., 376 U.S. 651, 84 S. Ct. 1044 (1964), the Supreme Court discussed a situation factually similar to the instant case. El Paso involved the acquisition of a gas company that was deemed a threat by one of its competitors, El Paso. A California utility had approached the acquired company, Pacific Northwest, about supplying natural gas, and when they reached a tentative agreement, El Paso responded by lowering its pricing and offering a firm supply of gas – as opposed to the intermittent supply that it had been providing – to the utility. Id. at 655, 84 S. Ct. at 1046. As a result, the

---

[4] Once the Government makes a showing that the firm controls an undue percentage share of the relevant market and the acquisition would cause a significant increase in the concentration, the defendant must produce evidence that shows the marketshare statistics inaccurately show the probable effect on competition. FTC v. Univ. Health, Inc., 938 F.2d 1206, 1218 (11th Cir. 1991).

tentative agreement with Pacific Northwest was terminated. The Court held that the acquired company was shown to have been a substantial factor in the California market: "Though young, it was prospering and appeared strong enough to warrant a 'treaty' with El Paso that protected El Paso's California markets." Id. at 659, 84 S. Ct. at 1048. The acquired company had not actually sold gas in the market but the Court noted that § 7 of the Clayton Act was concerned with probabilities, not certainties. Id. at 658, 84 S. Ct. at 1048. "Unsuccessful bidders are no less competitors than the successful one." Id. at 661, 84 S. Ct. at 1049. As the Court noted, "[w]e would have to wear blinders not to see that the mere efforts of Pacific Northwest to get into the California market, though unsuccessful, had a powerful influence on El Paso's business attitudes." Id. at 659, 84 S. Ct. at 1048. It then emphasized again that § 7 was intended to "arrest the trend toward concentration, the tendency to monopoly, before the consumer's alternatives disappeared." Id. at 659, 84 S. Ct. at 1049. In a healthy, growing market, the fact that the acquired company did not win a contract or had never sold in the market was not conclusive. Id. at 660, 84 S. Ct. at 1049.

Like the acquired company in El Paso that was already engaged in the business of selling gas in other markets, Microporous was already making similar separators. It would need only to retool a production line, and it had already

11

purchased a new one that could produce the SLI separators. It had begun discussions with several companies and had produced a sample product satisfactorily for at least one large customer. It had even submitted quotes and entered into memoranda of understanding with another large customer. Both Polypore and El Paso certainly considered the companies that they acquired to be competitive threats. Both companies lowered their prices and gave other concessions in response to their customers' dealings with the acquired companies. Polypore began to discuss the possibility of acquiring Microporous to eliminate competition and developed the MP Plan to remove Microporous as a competitive threat not only in the deep-cycle market but also in the SLI market. As the Court stated in El Paso, the Clayton Act is about probabilities and not certainties. Polypore clearly viewed Microporous as a serious threat and sought to acquire it to eliminate that threat.

We conclude that the facts of the instant case are sufficiently similar to those in El Paso such that it guides our decision in this case. In both cases, the pre-acquisition relevant market was highly concentrated.[5] In both cases, the acquisition ensured a continuation of the high concentration and eliminated the decrease in

---

[5] El Paso supplied more than 50% of the gas consumed in California and was the only out-of-state provider. Here, Daramic controlled 48% of the SLI market to Entek's 52%, and one battery producer testified that the two did not act as competitors.

concentration that would result from the acquired company's entry into the market. In both cases, the pre-acquisition market activity by the acquired company – although resulting in no actual sales – had a substantial, actual pro-competitive effect on the market.[6] In both cases, the perception by the acquiring company of the competitive threat posed by the acquired company provided additional evidence of the acquired company's competitive presence.[7] Indeed, the instant case is stronger for the government than was El Paso in that here, there was additional evidence that Polypore increased SLI prices following the acquisition.

As noted above, in concluding that the acquisition may substantially lessen competition in the SLI market, the Commission applied the Philadelphia National presumption. Polypore's primary challenge to the Commission's application of the presumption is that the Commission erred by treating Microporous as an actual competitor, rather than using the potential competitor analysis. Although we have noted that the instant case seems very close in principle to El Paso, it is true that the

---

[6]      In El Paso, Pacific Northwest's dealings with the utility customer caused El Paso to depart from its previous offer of interruptible supply and offer the utility a long-term contract for firm deliveries and at lower prices. In the instant case, Microporous's dealings with East Penn caused Polypore to make price concessions to East Penn. Similarly, Microporous's overture to JCI caused Polypore to seek a longer term contract.

[7]      See Graphic Prods. Distribs., Inc. v. Itek Corp., 717 F.2d 1560, 1573 (11th Cir. 1983) ("Evidence of intent is highly probative . . . 'because knowledge of intent may help the court to interpret the facts and to predict consequences.'") (quoting Chi. Bd. of Trade v. United States, 246 U.S. 231, 238, 38 S. Ct. 242, 244 (1918)).

Supreme Court in that case did not expressly invoke the presumption, and did not expressly label the acquired company as an actual competitor.[8]  However, a later Supreme Court case did so.  In United States v. Marine Bancorporation, 418 U.S. 602, 94 S. Ct. 2856 (1974), the Court stated that El Paso was an actual competitor case, rather than a potential competitor case.  Id. at 623, 94 S. Ct. at 2871.  Thus, because El Paso was an actual competition case, because it is very close in principle to this case, and because the actual competitor issue is Polypore's primary challenge in this regard,[9] we see no error resulting from the Commission's application of the Philadelphia National presumption to find that Polypore had illegally acquired Microporous, thus substantially lessening competition.[10]

---

[8]  Although El Paso did not use the term actual competitor, that meaning was clear. The court held: "Unsuccessful bidders are no less competitors than the successful one." 376 U.S. at 661, 84 S. Ct. at 1049.  It also noted that the acquired company's efforts to win contracts, "though unsuccessful, had a powerful influence" on El Paso. Id. at 659, 84 S. Ct. at 1048. Similarly, Microporous was an unsuccessful bidder, and its efforts had an influence on the market very similar to that in El Paso.

[9]  Polypore's only other argument – that the acquisition here did not increase concentration because Microporous had no actual pre-acquisition sales in the market – is foreclosed by El Paso.  Moreover, the acquisition here did increase concentration in that it eliminated the pre-acquisition influence on the market exercised by Microporous.  And, it eliminated the competition in the market which Polypore itself contemplated in its MP Plan.

[10]  Our confidence that Microporous was an actual competitor is amply supported by the Supreme Court decisions in El Paso and Marine Bancorporation. That conclusion, and the applicability of the presumption, is also confirmed by the leading scholar:

The acquisition by an already dominant firm of a new or nascent rival can be just as anticompetitive as a merger to monopoly.  If the rival has already made its first sale in the monopolist's market, the merger is clearly "horizontal."  If the rival has not yet made its

14

To overcome the <u>Philadelphia National</u> presumption, Polypore would need to show that the merger to duopoly did not have an anticompetitive effect. This it cannot do. The representative for Exide testified that prices for SLI separators are less favorable than those submitted before the acquisition. Specifically, the representative testified that it will "pay more, in the millions of dollars more" than it did before the acquisition. Polypore has not pointed to any evidence that negates this evidence of anticompetitve effect.[11] Thus, we hold that the Commission

first sale, the tendency is to call the acquisition a "potential competition" or non-horizontal merger. But the distinction between "actual" and "potential" competition is readily exaggerated. For example, a firm that submits bids against the dominant firm but loses is clearly an "actual" competitor, perhaps even forcing the dominant firm to lower its bid in the face of a rival bidder. But even the firm that is preparing to make its first bid or its first sale must be counted as an "actual" rival once the entry decision has been made.

Acquisition of such a rival preserves the dominant firm's status, at least until another nascent rival appears on the scene. In most such cases, we do not believe it is worthwhile to ascertain the number of rivals or the likelihood or time period in which another nascent rival will appear. The important point is that the acquisition eliminates an important route by which competition could have increased in the immediate future. It thus bears a very strong presumption of illegality that should rarely be defeated.

4 Phillip E. Areeda & Herbert Hovenkamp, <u>Antitrust Law</u> ¶ 912a (3d ed. 2006).

[11]    Our careful review of the record persuades us that the several challenges to the Commission's findings of fact are wholly without merit – e.g., with respect to whether Microporous's dealings with JCI, Exide, and East Penn involved the SLI market; with respect to whether Microporous's board of directors was on board with the expansion plans of management; with respect to the imminent capability of Microporous to supply the SLI market; and with respect to whether before acquisition, Polypore did in fact act in procompetitive ways (in the SLI market as well as the other two markets) in response to Microporous's dealings in the market.

correctly found that the merger substantially lessened competition and violated § 7 of the Clayton Act.[12]


B. Deep-Cycle Separators

Polypore argues that its product and Microporous's product for deep-cycle batteries were not close competitive substitutes and so should not be considered part of the same product market. Polypore cites United States Anchor Manufacturing, Inc. v. Rule Industries, Inc., 7 F.3d 986, 995-99 (11th Cir. 1993), where we held that if customers perceive a significant quality difference between the products, especially where there is a wide disparity in price, the court will treat the products as being in separate markets. Polypore argues that Microporous's pure rubber separators were recognized as being superior in deep-cycle applications and that customers were willing to pay a premium for that superiority. Daramic HD, the Polypore competitor to Microporous's Flex-Sil, was only able to gain a small portion of the deep-cycle market and was used exclusively in low-end batteries. Polypore points to the fact that several of the battery makers had not

---

[12] Because we conclude that this case is guided by El Paso, and because the Commission properly applied the Philadelphia National presumption, we do not reach the Commission's alternative holding that the acquisition violated § 7 based on the potential competitor doctrine.

16

qualified Daramic HD for use and another exclusively used Microporous's product. Ninety percent of the market was in Microporous's hands and accounted for most of Microporous's sales.

"Defining a relevant product market is primarily a process of describing those groups of producers which, because of the similarity of their products, have the ability—actual or potential—to take significant amounts of business away from each other." U.S. Anchor, 7 F.3d at 995 (quotations and citations omitted). As such, it is a factual question that we review for clear error. United States v. Engelhard Corp., 126 F.3d 1302, 1305 (11th Cir. 1997). In U.S. Anchor, we looked at the factors set forth in Brown Shoe Co. v. United States, 370 U.S. 294, 82 S. Ct. 1502 (1962):

> industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors . . . .

U.S. Anchor, 7 F.3d at 995 (quoting Brown Shoe, 370 U.S. at 325, 82 S. Ct. at 1523). "The boundaries of the product market are determined by 'the reasonable interchangeability of use . . . between the product itself and substitutes for it.'" Engelhard, 126 F.3d at 1305 (quoting Brown Shoe, 370 U.S. at 325, 82 S. Ct. at 1523-24).

Here, the Commission based its finding on the switch of several battery producers from Flex-Sil to Daramic HD. Daramic HD increased its share of the market, at Flex-Sil's expense, from 3.8% in 2005 to 10.6% in 2007. The Commission specifically cited the switch by U.S. Battery and Exide, with the latter using both Flex-Sil and Daramic HD in its golf cart batteries, which make up 80% of its sales. Significantly, the Commission also pointed to the successful threat by three companies to switch to Daramic HD to avoid a price increase by Microporous. If the two brands were not interchangeable, the threat would not have been successful. There is also evidence that Microporous considered the two competitors: in its own pre-acquisition assessment of its value to Polypore, Microporous noted that Polypore would gain complete control of the deep-cycle separator market if the acquisition occurred.

There is ample evidence to support the Commission's finding that there was only one market for deep-cycle battery separators. Several of the battery producers used both products in their deep-cycle batteries and used the presence of Daramic HD to bring down Microporous's prices. While the industry recognized that Flex-Sil, being a pure rubber separator, was superior, it was willing to substitute Daramic HD when it could in order to keep prices lower. Thus, although there were distinct prices, there were not distinct customers. The products were used for

18

slightly different purposes – i.e., Flex-Sil was used in higher end batteries than Daramic HD – but both were used in deep-cycle applications and both were made in the same type of production facilities. Thus, under the Brown Shoe factors, we conclude that the Commission did not err when it found that there existed only one market.

### C. Motive Separators

Polypore argues that the Commission erred in holding that Polypore had not shown that Entek would enter the motive battery market and counteract the anticompetitive effects of the merger to monopoly in that market. It points out that motive battery separators are made from PE, the same substance used in SLI separators. The only difference between the two types of separators is that motive separators are generally larger and thicker. Accordingly, the only difference in the production lines is larger rollers, which are easily switched out in a matter of hours. Additionally, Polypore highlights the fact that Entek produced motive separators in the 1990s, and expressed interest in resuming that role in 2006 when Daramic had a strike.

The Commission did not err when it held that Polypore had not shown that Entek was a participant in the motive battery market or that it had plans to enter it.

19

Although Entek was approached by both Exide and EnerSys, it failed to follow through with those overtures. As of the time of the trial, in June 2009, Entek had not even run any material for Exide. EnerSys repeatedly made overtures to Entek, only to have it finally respond with an unsatisfactory quote. Polypore has not pointed to any evidence that rebuts these findings.

### D. Divestiture

Conceding that the Commission enjoys broad authority to craft a remedy, Polypore argues that the divestiture order was too extensive because it included Microporous's Austrian plant. The Commission's authority, it argues, must relate logically to the harms identified by the Commission and the specific markets at issue. Polypore notes that the Commission specifically limited the relevant markets to North America and held that battery separator producers outside of North America did not compete here. The Commission stated that its rationale for including the Austrian plant was to allow the acquiring company to maintain sufficient capacity at the Tennessee plant to compete effectively in North America. But, Polypore asserts, the Commission had already determined that Microporous was an effective and important competitor for North American customers from its Tennessee plant alone. Additionally, Polypore posits, the evidence showed that

there was excess production capacity at the Tennessee plant. Finally, Polypore argues that the Commission did not explain why an Asian or European separator manufacturer would not be fully satisfied with just the North American facility, which would satisfy its need for a foothold in North America.

The Commission has broad discretion in the formulating of a remedy for unlawful practices. Jacob Siegel Co. v. FTC, 327 U.S. 608, 611, 66 S. Ct. 758, 760 (1946). Here, the Commission did not abuse its discretion when it ordered the divestiture of the Austrian plant. The Commission reasoned that the Austrian plant needed to be divested to restore the competition eliminated by the acquisition and provide the acquirer with the ability to compete. Ford Motor Co. v. United States, 405 U.S. 562, 573, 92 S. Ct. 1142, 1149 (1972) ("The relief in an antitrust case must be 'effective to redress the violations' and 'to restore competition.'") (quoting United States v. E. I. Du Pont De Nemours & Co., 366 U.S. 316, 326, 81 S. Ct. 1243, 1250 (1961)). It found that when Microporous produced CellForce for its foreign customers at its Tennessee plant, capacity constraints limited its ability to compete for additional North American business. However, once the Feistritz plant was constructed, Microporous was able to commit to additional North American sales to customers. Additionally, the Commission reasoned that multiple plants provide insurance against supply disruptions and provide the ability to

21

supply local customers, which in turn made Microporous a more effective competitor. These are all reasonable considerations such that we will not disturb the order.[13]

## IV. CONCLUSION

For the reasons stated above, we conclude that the Commission is due to be affirmed. The Commission did not err when it treated the acquisition as a horizontal merger, found that there was a single market for deep-cycle separators, determined that Entek would not enter the motive market, and included Microporous's Austrian plant in its divestiture order.


**AFFIRMED**.

---

[13]     Polypore argues in its reply brief that the divestiture order should have contained a "safety valve," like that found in Chicago Bridge & Iron Co. v. FTC, 534 F.3d 410 (5th Cir. 2008), which permitted the exclusion of certain assets in the divestiture order if the acquirer and the monitor trustee both found them unnecessary. However, Polypore neither raised this issue before the Commission nor in its initial brief so the issue is waived. See Norelus v. Denny's, Inc., 628 F.3d 1270, 1297 (11th Cir. 2010) (initial brief); Cotherman v. FTC, 417 F.2d 587, 591-92 (5th Cir. 1969) (exhaustion before the FTC).